**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY<br><br>Plaintiff,<br><br>v.<br><br>PATRICIA BRUNO and GABRIELLE BRUNO and SAMARITANS-AT-LAST, LLC<br><br>Defendants. | : | CIVIL ACTION NO. __________________ |

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Defendant, Continental Casualty Company ("Continental"), by and through its counsel, Cozen O'Connor, files this Complaint for Damages and Declaratory Relief against Patricia Bruno ("Patricia"), Gabrielle Bruno ("Gabrielle") and Samaritans-At-Last, LLC ("SAL," together with Patricia and Gabrielle, "Defendants") and, in support thereof, states as follows:

**PARTIES**

1. Continental is an insurance company organized and existing under the laws of the State of Illinois with its principal place of business located at 151 N. Franklin Street, Chicago, Illinois 60606, and is therefore deemed to be a citizen of the State of Illinois.

2. Patricia is an adult individual residing at 116 Stoney Brook Boulevard, Newtown Square, Pennsylvania 19073, and is a citizen of the Commonwealth of Pennsylvania.

3. Gabrielle is an adult individual residing at 116 Stoney Brook Boulevard, Newtown Square, Pennsylvania 19073, and is a citizen of the Commonwealth of Pennsylvania.

4. SAL is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with its corporate headquarters and principal place of business

located at 1055 Westlakes Drive, Suite 300, Berwyn, Pennsylvania 19312-2410, and is therefore deemed to be a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6. Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(1) because the Eastern District of Pennsylvania is the judicial district in which Patricia and Gabrielle reside and in which SAL is located.

7. Venue is also proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because the Eastern District of Pennsylvania is the judicial district in which a substantial part of the acts and omissions giving rise to Continental's claims against Defendants occurred.

## FACTS COMMON TO ALL COUNTS

8. This is an action in which Continental alleges fraud, civil conspiracy and other causes of action against Defendants in connection with a claim for benefits under a long term care insurance policy ("Policy") issued to Patricia by Continental.

9. Gabrielle is Patricia's daughter and was, at all relevant times, a member of Patricia's "immediate family" living with her.

10. SAL purports to be a Home Health Care Provider, as defined in the Policy.

11. SAL is owned by Davis Menya, Patricia and Gabrielle's neighbor and a member of their church community.

12. Patricia retained SAL as her putative home health care agency. SAL, in turn, purportedly hired Gabrielle as Patricia's putative caregiver. As discussed extensively below, that was done to give Continental the false appearance that Patricia was receiving care services from an approvable caregiver when, in fact, she was not.

13. Gabrielle purports to be a 1099 contractor with SAL and has represented to Continental that she is paid a portion of billed amounts after agency deductions.

14. Gabrielle purports to have provided paid home health care services to Patricia as a contractor for SAL, for which Defendants sought and received monetary benefits under a long term care insurance Policy issued to Patricia by Continental.

15. Defendants represented to Continental for more than five and a half years that Patricia was entitled to be paid benefits under the Policy for care services she allegedly received in the home each day due to functional limitations and cognitive deficits from which Patricia claimed to suffer.

16. In fact, the claim was a sham. Defendants conspired to defraud Continental of $209,780.00 of insurance benefits in connection with the claim. Patricia also failed to pay Continental approximately $9,509.78 in premiums that would have come due but for Defendants' fraudulent scheme.

17. Defendants committed insurance fraud in at least four broad and sweeping ways, each of which independently qualifies as fraud under the law.

18. *First*, Defendants represented to Continental that Patricia met the benefit eligibility triggers in the Policy due to severe functional limitations and cognitive deficits that allegedly led her to require hours of care from a paid caregiver in the home each day.

19. In fact, Patricia did not have benefit-qualifying functional limitations and cognitive deficits for which she required care in the home. Defendants were fully aware that their representations to Continental regarding Patricia's functionality and cognition were false and that she was not functionally nor cognitively impaired in a manner that would have allowed her to seek benefits under her coverage. This was fraud.

20. *Second*, Defendants failed to disclose to Continental and intentionally concealed the fact that Patricia's putative caregiver identified in signed Proof of Loss was, in fact, Gabrielle, Patricia's daughter, who lived with her. This mattered because coverage under the Policy was not available for home health care provided by a member of Patricia's immediate family living with her, such as Gabrielle.

21. By failing to disclose to Continental and intentionally covering up the fact that Patricia's caregiver was, in fact, her daughter, a member of Patricia's immediate family living with her, Defendants were able to obtain benefit payments from Continental that would have been denied had they told the truth, since Gabrielle is not an eligible home health care provider. This was fraud.

22. *Third*, Policy benefits were only available if Patricia *required* and *received* Long Term Care services pursuant to a written Plan of Care, as those terms are defined in the Policy.

23. Defendants represented to Continental over the life of Patricia's claim that she required and received Long Term Care services pursuant to a written Plan of Care when, in fact, she did not. Indeed, she did not receive any care services at all. This was fraud.

24. *Fourth*, Defendants were required to provide true and correct written Proof of Loss to Continental in which they specified the dates, times, and nature of care services Patricia received from an eligible paid caregiver, plus the amounts she actually paid for care. Continental was only

required to pay benefits to the extent Defendants provided true and correct Proof of Loss for paid care services Patricia actually received.

25. Defendants, however, provided false Proof of Loss and other information to Continental in which they described Patricia's receipt and payment for care services that were never actually rendered but were a complete fiction.

26. SAL initially submitted to Continental an invoice for care services purportedly provided to Patricia each day in the home from December 16, 2019 to December 31, 2019 and January 1, 2020 to April 18, 2020 with weekly caregiver logs indicating daily care from 8:00 am-10:00 am and 6:00 pm-8:00 pm, including assistance with bathing and transferring, which were signed and certified by Patricia and Gabrielle. The invoices and weekly care notes submitted by SAL to Continental thereafter through October 2025, which indicated that care was purportedly provided to Patricia each day in the home from 8:00 am-10:00 am and 6:00 pm-8:00 pm, including assistance with bathing and transferring, were signed by SAL Management. These invoices and weekly care notes were signed and submitted by SAL based upon false information provided by Patricia and Gabrielle, which fraudulent process was repeated by Defendants week after week and year after year.

27. Indeed, Gabrielle admitted to Continental during a recorded video interview that she was outside of Pennsylvania, in Virginia, for multiple and significant time periods (ironically, attending law school) when she reported providing care to Patricia at Patricia's home in Pennsylvania, and she specifically acknowledged billing Continental for services never rendered to Patricia. Gabrielle further admitted to Continental that she was not physically present with Patricia for at least 120 days when services were billed, during which time Gabrielle was incapable of providing assistance or supervision to Patricia as required by the Policy. This was fraud.

28. Continental performed eight periods of surveillance. The surveillance, along with Continental's other investigative efforts, including a telephone interview of Patricia and a video interview of Patricia and Gabrielle, showed that: Patricia was active in the community on multiple occasions and clearly was not eligible for benefits and Defendants knowingly made false representations concerning the same; Gabrielle, in fact, lives with Patricia; Patricia did not receive Long Term Care services in accordance with a written Plan of Care (or otherwise); and Defendants submitted false Proof of Loss and other information to Continental in which they described Patricia's receipt and payment for care services that were never actually rendered.

29. On any given date on which Gabrielle was purportedly providing care, she was either an immediate family member living with Patricia (and was therefore not qualified to provide care) or else was not physically present with Patricia or even in the same state.

30. By knowingly misrepresenting and/or concealing facts concerning Patricia's functionality and cognition, relationship with Gabrielle, alleged receipt of care services and payment for care, Defendants fraudulently induced Continental to pay long term care insurance benefits they were not lawfully entitled to receive.

**A. <u>The Insurance Coverages at Issue</u>**

31. On or about October 19, 2002, acting in reliance on Patricia's representations in application materials, Continental issued to Patricia Long Term Care Insurance Policy Number 077193634 (the "Policy").

32. At issuance, Patricia was designated as the insured and owner of the Policy.

33. Patricia was also the beneficiary of the Policy when issued, meaning benefits under the Policy, if any, would be paid to Patricia. A true and correct copy of the Policy, excluding the

application (which contains Protected Health Information in accordance with the HIPAA statute) is attached hereto as **Exhibit A**.

34. The Policy provides a Home and Community-Based Care Benefit in the event Patricia meets the Policy's eligibility requirements for the payment of benefits.

35. To be eligible for the payment of benefits under the Policy, a Duly Licensed Physician must certify that care or services are required due to: "1. Your Inability to Perform Two or More Activities of Daily Living ["ADLs"]; or 2. Your Cognitive Impairment; or 3. Medical Necessity."

36. The ADLs defined in the Policy include Eating, Dressing, Bathing, Toileting, Transferring and Continence.

37. The Policy defines the Inability to Perform Two or More ADLs as the "Loss of the functional capacity to do at least 2 [ADLs] without Hands-On Assistance or Supervisory Assistance from another person."

38. Hands-On Assistance means "the physical assistance of another person without which You would be unable to perform the [ADL]."

39. Supervisory Assistance means "the presence of another person within arm's reach of You that is necessary to prevent, by physical intervention, injury to You while You are performing an [ADL] (such as being ready to catch You if You fall while getting into or out of the bathtub or shower as part of Bathing….)."

40. The Policy defines Cognitive Impairment as: "A deficiency in Your short- or long-term memory, orientation as to person, place and time, deductive or abstract reasoning, or judgment as it relates to safety awareness."

41. Continental will pay benefits under the Policy when the insured requires Home and Community-Based Care, including Long Term Care from a Home Health Care Provider or an Independent Caregiver.

42. The Policy defines "Home Health Care Provider," in pertinent part, as an entity which provides home health care and has an agreement as a provider of home health care services or is licensed or accredited by state law as a home health care agency, if such licensing or accreditation is required by the state in which the care is received. Home health care services include services provided by a home health aide, homemaker, and similar services.

43. The Policy specifically states: "A Home Health Care Provider cannot be a member of Your immediate family living with You."

44. The Policy also provides an Independent Caregiver Certification Benefit, which allows the insured the freedom to choose the individual who will be providing her Home and Community-Based Care.

45. The Policy specifically states: "An Independent Caregiver cannot be a member of Your immediate family living with You."

46. Thus, in summation, in the event that Patricia required Hands-On Assistance or Supervisory Assistance from another person to perform 2 or more of the six ADLs defined in the Policy, or she required care or services due to Cognitive Impairment or Medical Necessity, the Policy would pay benefits to Patricia for care provided by an eligible caregiver provided Patricia satisfied all other Policy requirements concerning the payment of benefits.

47. For the sake of this lawsuit, three other Policy terms and conditions are directly implicated.

48. *First*, assuming that Patricia was eligible for the payment of benefits under the Policy and had an eligible caregiver who was not a member of her immediate family living with her, benefits under the Policy were only triggered and paid if Patricia incurred *actual expenses* for Long Term Care (as defined in the Policy) that were *actually rendered* to her in accordance with a Plan of Care (as defined by the Policy). This meant that Patricia needed to *actually receive* care services in exchange for renumeration, then submit invoices and other written Proof of Loss to Continental in order for benefits to be paid.

49. Long Term Care is defined as: "Necessary diagnostic, preventive, therapeutic, rehabilitative, maintenance or personal care services, which are provided in a setting other than an acute care unit of a hospital and pursuant to a Plan of Care prescribed by a Duly Licensed Physician."

50. A Plan of Care is: "A program of care and treatment: 1. Initiated by and approved in writing by a Duly Licensed Physician before the start of such care and treatment; and 2. Confirmed in writing at least once every 60 days."

51. *Second*, Patricia needed to provide true and correct written Proof of Loss and other information to Continental as a contractual precondition to any claim being paid. The written Proof of Loss needed to include, among other things, a written statement describing the type and nature of her loss. Absent the submission of this information, and the truthfulness thereof, Continental had no duty to pay Patricia's claim.

52. *Third*, as with all insurance coverages, Patricia was required to pay premium in order to keep the Policy in-force. Failure by Patricia to pay premium timely would result in the Policy lapsing and terminating in accordance with its terms.

53. Notwithstanding the requirement that Patricia pay premium to keep coverage in-force, the Policy contains a Waiver of Premium Benefit. In accordance with this Benefit, Patricia's premium obligation would be waived after 12 days of covered Long Term Care during a Plan of Care during the pendency of a *legitimate* claim for benefits, so the Policy would not lapse for nonpayment of premium.

**B. <u>Patricia's Claim for Benefits Under the Policy</u>**

54. On or about December 16, 2019, Patricia's husband contacted Continental's administrative team to initiate a claim for benefits under the Policy following a surgery undergone by Patricia earlier that month due to breast cancer. He indicated that no home care services were in place yet.

55. In March of 2020, Continental was advised that SAL had begun providing home care services to Patricia.

56. The claim was initially approved with an eligibility date beginning February 2, 2020 under the Policy's Medical Necessity trigger and because Patricia was purportedly unable to perform the ADL of bathing without assistance from another person.

57. In connection with the claim approval, Continental's claim team explicitly notified Patricia in writing that, in order to receive payment for eligible expenses, Patricia and her home health care provider must submit a caregiver timesheet or detailed invoice and daily visit notes (DVN's) for all dates of service. Patricia was notified that this required documentation must be completed at the time care is provided, and be signed and dated by both Patricia's caregiver and Patricia or her legal representative. She was advised:

> The signatures attest to the accuracy of the information. A new timesheet must be completed for each week of care. Timesheets and DVN's should be completed accurately each day, reflecting all

> services provided and specific hours and days worked. Your timesheets and DVN's should not be copied from one day to another.

58. On April 20, 2020, Continental received a request to backdate the approval to December 16, 2019, representing that to be the date on which home care from SAL allegedly began.

59. On or about May 14, 2020, SAL initially submitted an invoice for care services purportedly provided to Patricia each day in the home from December 16, 2019 to December 31, 2019 and January 1, 2020 to April 18, 2020 with weekly caregiver logs indicating daily care from 8:00 am-10:00 am and 6:00 pm-8:00 pm, including assistance with bathing and transferring, which were signed and certified by Patricia and Gabrielle. Continental paid benefits pursuant to the terms of the Policy.

60. Continental determined that Patricia continued to be benefit eligible and her claim was approved through November 24, 2020 based upon Medical Necessity. SAL was approved as the eligible home health care provider for four (4) hours per day/seven (7) days per week and Continental continued to pay benefits.

61. As a result of the claim being approved, Patricia also triggered the Policy's Waiver of Premium Benefit. This meant that premium for the Policy went into waiver status. But for the Policy's Waiver of Premium Benefit having been triggered by Patricia's claim, Patricia would have been required to pay $9,509.78 in premium for the Policy.

**C. <u>Submission of False Proof of Loss</u>**

62. As a contractual precondition to the payment of benefits under the Policy, Patricia and her putative caregiver were required to provide Continental with true and correct written Proof of Loss.

63. Patricia and her putative caregiver were required to complete, sign and submit a Proof of Loss each week over the life of the claim in order to be paid benefits and for premium to continue to be waived.

64. In each Proof of Loss submission, Patricia and her putative caregiver were required to state the specific dates and times when Patricia received care services in the home, and for which she was claiming benefits under the Policy.

65. Thus, it was clear to Defendants that their representations in each submission would be used by Continental to determine whether it would pay benefits and the amount of benefits to be paid.

66. Indeed, Continental a had no duty under the Policy to pay benefits in the absence of these submissions.

67. In fact, Defendants completed monthly invoices and weekly care notes for December 16, 2019 through October 31, 2025. The care notes submitted for service dates through April 18, 2020 were signed and certified by Patricia and Gabrielle. All other invoices and care notes were signed and submitted by SAL Management based upon false information provided by Patricia and Gabrielle. These invoices and care notes, which were signed by SAL Management, represented daily care allegedly provided exclusively by "Gadriella Bruno" and later "Gabriella Bruno" to Patricia, lists of specific tasks completed (including shower/bathing, transferring and medication reminders), and time durations, always 8:00 am-10:00 am and 6:00 pm-8:00 pm.

68. Defendants submitted Proof of Loss to Continental covering every claimed date of care over the years-long life of Patricia's claim. In other words, Defendants made hundreds of discrete written representations to Continental in support of the claim over the course of years.

69. Defendants' representations in these Proof of Loss submissions were false, were known by all Defendants to be false, and were made with the intent of enabling Patricia to be paid benefits under the Policy that she was not lawfully entitled to receive.

**D. <u>Annual Reassessments</u>**

70. To maintain, substantiate, and systematically extend this stream of long term care benefits, Continental completed annual reassessments of Patricia's claim in order to determine whether she continued to be eligible to receive benefits.

71. These reassessments were based in part upon signed Proof of Loss from SAL, including weekly care notes, invoices and other communications, and served as the structural mechanism through which Defendants repeatedly reaffirmed Patricia's ongoing eligibility to Continental's claim team and clinical reviewers.

72. Continental reassessed Patricia for benefits on or about December 9, 2020 in accordance with its rights under the Policy. This assessment was performed virtually (during the COVID period) by an independent nurse-assessor who was not affiliated with Continental or Patricia, and was based entirely upon Patricia's representations as well as those of her husband and a Case Manager from SAL, who were present with her during the assessment.

73. Patricia represented during this assessment that she was experiencing chronic severe pain throughout her body from small fiber neuropathy as well as limited range of motion in both arms and her neck from herniated discs in her neck and back, a right torn rotator cuff without repair from a fall in 2019, and a left breast mastectomy in December 2019.

74. The SAL Case Manager reported that, due to physical limitations in range of motion, chronic pain, and the need for reminders, the staffed home health aide set up Patricia's

medications and provided reminders to take them. Patricia's husband also supposedly provided assistance with set up and reminders to take medications.

75. During the virtual assessment, Patricia was observed ambulating and transferring with a walker.

76. Patricia represented during the assessment that hands-on assistance was provided by home health aides multiple times daily to change soiled bed linens, clothing, and pads due to bladder incontinence.

77. In addition, Patricia represented that she was unable to drive due to chronic pain and limited range of motion in both shoulders and arms and her neck.

78. All representations during this assessment were false, were known by Defendants to be false, and were made with the intent of enabling Patirica to be paid benefits under the Policy that she was not lawfully entitled to receive.

79. Based on these and other representations by Patricia and Defendants to the nurse-assessor, Continental reapproved the claim and continued to pay benefits based on Medical Necessity and Stand-By Assistance with at least 2 ADLs – dressing and bathing – from November 24, 2020 through June 28, 2021 pursuant to a Plan of Care developed by a Care Manager for Continental, provided Patricia continued to meet the eligibility requirements during that time. The frequency of service by SAL approved for Home Health Care benefits was 4 hours per day/7 days per week. Patricia was not eligible based on the Cognitive Impairment trigger in the Policy as she scored a perfect 30/30 on the Mini Mental State Examination ("MMSE") that was administered during the assessment, which indicated that her cognition was objectively unimpaired.

80. In 2021, Continental reassessed Patricia's claim and, based upon the signed Proof of Loss and other communications from Defendants, Continental reapproved the claim and

continued to pay benefits due to Medical Necessity and Stand-By Assistance with at least 2 ADLs – dressing and bathing – from June 28, 2021 through June 28, 2022 pursuant to a Plan of Care developed by a Care Coordinator for Continental, provided Patricia continued to meet the eligibility requirements during that time. The frequency of service by SAL approved for Home Health Care benefits was 4 hours per day/7 days per week. Continental's reapproval of the claim was based on Defendants' representations regarding Patricia's functionality, her receipt of care (including assistance with Dressing and Bathing and Transfers), and her costs incurred for the care purportedly rendered.

81. In 2022, Continental reassessed Patricia's claim and, based upon the signed Proof of Loss and other communications from Defendants, Continental reapproved the claim and continued to pay benefits based on Medical Necessity for assistance with Bathing, Dressing and Continence and Stand-By Assistance with at least 2 ADLs from June 28, 2022 through January 20, 2023 pursuant to a Plan of Care developed by a Care Coordinator for Continental, provided Patricia continued to meet the eligibility requirements during that time. The frequency of service by SAL approved for Home Health Care benefits was 4 hours per day/7 days per week. Continental's reapproval of the claim was based on Defendants' representations regarding Patricia's functionality, her receipt of care (including assistance with Bathing, Transfers, Dressing and Continence), and her costs incurred for the care purportedly rendered.

82. Continental reassessed Patricia's claim in 2023 and, based upon the signed Proof of Loss and other communications from Defendants, Continental reapproved the claim and continued to pay benefits based on Medical Necessity and Hands-On or Stand-By Assistance with Bathing and Dressing from January 20, 2023 through January 25, 2024 pursuant to a Plan of Care developed by a Care Coordinator for Continental, provided Patricia continued to meet the

eligibility requirements during that time. The frequency of service by SAL approved for Home Health Care benefits was 4 hours per day/7 days per week. Continental's reapproval of the claim was based on Defendants' representations regarding Patricia's functionality, her receipt of care (including assistance with Bathing and Dressing and Transfers), and her costs incurred for the care purportedly rendered.

83. Continental reassessed Patricia's claim in 2024 and, based upon the signed Proof of Loss and other communications from Defendants, Continental reapproved the claim and continued to pay benefits from January 25, 2024 through January 29, 2025, provided Patricia continued to qualify for coverage under the Policy during that time. Continental's reapproval of the claim was based on Defendants' representations regarding Patricia's functionality, her receipt of care (including assistance with Bathing/Showering and Transferring), and her costs incurred for the care purportedly rendered.

84. At the end of 2024, Continental reassessed Patricia's eligibility for benefits and, based upon the signed Proof of Loss and other communications from Defendants, determined that Patricia continued to qualify for benefits under the Policy and continued to pay benefits. Patricia's benefit eligibility period was extended December 31, 2024 through December 31, 2025, provided she continued to qualify for coverage under the Policy during that time. Continental's reapproval of the claim was based on Defendants' representations regarding Patricia's functionality, her receipt of care (including assistance with Bathing/Showering and Transferring), and her costs incurred for the care purportedly rendered.

85. The representations during these reassessment periods and Proofs of Loss provided by Defendants was essential to Continental's evaluation of the claim and payment of benefits. It was the primary means by which Continental was led to believe that Patricia remained eligible for

benefits under the Policy. Absent the continuous reaffirmation of these representations and submission of Proof of Loss, Patricia's claim would not have been paid.

86. Upon information and belief, all representations concerning Patricia's functionality and Proofs of Loss provided to Continental over the life of the claim were false, were known by Defendants to be false, and were fabricated by Defendants for the singular purposes of inducing Continental to pay Patricia's fraudulent claim.

## D. <u>Continental's Claim Investigation</u>

### 1. April 2025 Surveillance

87. On April 4, 5 and 6, 2025, Continental performed surveillance on Patricia at the Bruno residence in Newtown Square, Pennsylvania.

88. For each date of surveillance, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

89. On April 5, 2025, Patricia was observed briefly opening the front door of the house and retrieving a package.

90. No caregiver activity was observed at the residence during the surveillance period. Critically, no caregiver arrived at or departed the Bruno residence, as reported in the signed Proof of Loss. Upon information and belief, paid care was not provided (or needed) during the period of surveillance.

91. Continental's observations could not be reconciled with Defendants' representations and written Proof of Loss for the very same time period. Continental determined that additional investigation was appropriate.

**2. May 2025 Surveillance**

92. On May 1, 2025, Continental performed surveillance on Patricia and Gabrielle over a 10-hour period beginning at the Bruno residence and traveling to Rose Tree Park, where they attended an outdoor event.

93. On this date, Patricia was on claim with Continental and purported to be eligible to receive benefits under the Policy. Defendants provided a signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services that day, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours.

94. Continental's surveillance revealed Patricia at the event at Rose Tree Park exiting a vehicle and walking independently without a cane or walker, bending, standing, and raising her hands above shoulder level. Most surprisingly, Patricia was seen *dancing.* Patricia was also documented providing volunteer services, interacting with and hugging other attendees, and making speeches to the crowd from behind a podium.

95. At no time was Gabrielle seen providing hands-on or standby assistance to Patricia, who clearly did not need it.

96. Continental's observations on video could not be reconciled with Defendants' representations and written Proof of Loss for the very same day. Continental determined that additional investigation was appropriate. Some of Continental's many observations of Patricia at the event at Rose Tree Park included the following:


05/01/2025
10:49:47 AM


05/01/2025
11:15:04 AM


05/01/2025
11:18:46 AM


05/01/2025
12:05:08 PM


05/01/2025
12:06:38 PM





### 3. May-June 2025 Surveillance

97. On May 24, June 1 and 2, 2025, Continental performed surveillance at the Bruno residence in Newtown Square, Pennsylvania.

98. For each date of surveillance, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

99. Neither Patricia nor Gabrielle were observed during the surveillance period. No caregiver arrived at or departed the Bruno residence, as reported in the signed Proof of Loss. Care was clearly not provided (or needed) during the period of surveillance.

100. Continental's observations could not be reconciled with Defendants' representations and written Proof of Loss for the very same time period. Continental determined that additional investigation was appropriate.

### 4. August 2025 Surveillance

101. On August 4, 2025, Continental performed surveillance at the Bruno residence in Newtown Square, Pennsylvania.

102. For this date, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

103. Neither Patricia nor Gabrielle were observed during the surveillance period. No caregiver arrived at or departed the Bruno residence, as reported in the signed Proof of Loss. Care was clearly not provided (or needed) during the period of surveillance.

104. Continental's observations could not be reconciled with Defendants' representations and written Proof of Loss for the very same time period. Continental determined that additional investigation was appropriate.

**5. September 2025 Surveillance**

105. On September 23 and 24, 2025, Continental performed surveillance at the Bruno residence in Newtown Square, Pennsylvania.

106. For each date of surveillance, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

107. Neither Patricia nor Gabrielle were observed at the residence during the surveillance period. No caregiver arrived at or departed the Bruno residence, as reported in the signed Proof of loss. Care was not provided (or needed) during the period of surveillance.

108. Continental's observations could not be reconciled with Defendants' representations and written Proof of Loss for the very same time period. Continental determined that additional investigation was appropriate.

### 6. September-October 2025 Surveillance

109. On September 30, October 1 and 2, 2025, Continental performed surveillance on Patricia and Gabrielle when they attended the Jubilee 2025 – 10 Days of Awe in Downtown Philadelphia.

110. For each date of surveillance, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

111. Continental's surveillance revealed Patricia at the event in Philadelphia dancing and waving flags, standing and listening to speakers, conversing with others, hugging people, utilizing a cell phone and taking videos, receiving an award, giving a lengthy interview to a media crew member, reaching, bending and walking a number of city blocks without a cane or walker.

112. At no time was Gabrielle seen providing hands-on or standby assistance to Patricia, who clearly did not need it.

113. Continental's observations on video could not be reconciled with Defendants' representations and written Proof of Loss for the very same time period. Continental determined that additional investigation was appropriate. Some of Continental's many observations of Patricia at the event in Philadelphia included the following:








**7. October 2025 Surveillance**

114. On October 21 and 22, 2025, Continental performed surveillance at the Bruno residence in Newtown Square, Pennsylvania.

115. For each date of surveillance, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance

with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

116. Patricia was not observed during the surveillance period.

117. On the first day, Gabrielle was observed departing the house around 8:54 am and attending a Pilates class for approximately one hour before returning home.

118. On the second day, Gabrielle was observed arriving at the house at 2:23 pm.

119. Continental's observations could not be reconciled with Defendants' representations and written Proof of Loss for the very same time period. Continental determined that additional investigation was appropriate.

### 8. October 27, 2025 Telephone Interview of Patricia

120. On October 27, 2025, Continental conducted a recorded interview of Patricia.

121. During the interview, Patricia made representations that contradicted the Proof of Loss provided to Continental and surveillance obtained by Continental.

122. Patricia stated that her need for care was due to: small fiber vessel neuropathy, which started about 10 years ago, with fluctuating flare-ups including persistent foot pain/tingling and current widespread itching; prior right rotator cuff injury, which occurred 8-9 years ago, causing limited mobility of her arm; low back issues; incontinence; and a recent fall in September 2025 causing wrist and rib fractures and tooth loss.

123. Patricia represented that she required assistance with bathing, dressing, toileting, transferring, and mobility as well as medication reminders, housekeeping, laundry, and meal preparation. She said that she received assistance with substantially all activities and tasks throughout the day, including getting up, showering, dressing, and all daily care tasks.

124. Patricia also represented that she was significantly impaired in mobility, balance, and self-care. Patricia stated that she could not put her arms straight up, it was difficult for her to lift a book, she had difficulty dressing, and she could not bend to put on socks and shoes. Patricia represented that she had difficulty getting in and out of bed and rising from sitting on the toilet.

125. Patricia represented that she used a cane or walker, and often relied on another person's support. She represented that she needed hands-on assistance from another person outside of the home.

126. She also stated that her driving was limited and that she used a minivan but had difficulty getting in and out.

127. Patricia admitted that the invoices and weekly care notes submitted to Continental were static and repetitive. Patricia attempted to reconcile this by reporting that her care schedule was inconsistent and, although the invoices and weekly care notes state that she was receiving care twice daily (8:00 am-10:00 am and 6:00 pm-8:00 pm), the hours varied based on what she wanted, as she did not live on that schedule. Patricia stated that Defendants record the hours appearing in the Proof of Loss because they need to record "something" in submissions to Continental. Patricia admitted that she does not review the invoices or weekly visit notes for accuracy. In other words, Patricia admitted that all or substantially all of the Proof of Loss Defendants had been providing to Continental in support of the claim was false.

128. Patricia further admitted that she lives with her husband and daughter. Patricia also stated that she primarily relies upon one caregiver from SAL. When asked the name of the caregiver, Patricia said she was going to need to sit down as she was getting a little tired. She then asked if the interview was almost finished. Patricia was asked if she has one daughter or other daughters living with her as well. She replied "I have multiple daughters. I mean, no, I have one

daughter, what am I saying?" She was then asked her daughter's name and, when pressed, finally admitted that her daughter is the same "Gabrielle" who works for SAL and purportedly serves as her caregiver.

129. Patricia also represented that Gabrielle did not care for other individuals (through SAL or otherwise), and has a separate business, which Patricia did not want to discuss during the interview.

130. The interview ended at Patricia's request with arrangements to continue two days later.

131. Patricia's statements, when compared against Continental's surveillance and the submitted Proof of Loss, confirm that egregious misrepresentations were made to Continental to induce Continental to pay benefits for services that were either unnecessary or not rendered.

132. The interview did not continue as scheduled. Patricia complained to Continental that she was uncomfortable during the interview on October 27, 2025 and, afterwards, she supposedly ended up bed ridden for three days from the "flare up" the interviewer caused to her nerves. She requested a new interviewer.

**9. November 2025 Surveillance**

133. On November 25, 26 and 28, 2025, Continental performed surveillance at the Bruno residence in Newtown Square, Pennsylvania.

134. For each date of surveillance, Defendants provided signed Proof of Loss to Continental representing that Patricia received paid Long Term Care services, including assistance with shower/bathing and transfers, from "Gabriella Bruno" in the home for 4 hours each day from 8:00 am-10:00 am and 6:00 pm-8:00 pm.

135. Neither Patricia nor Gabrielle were observed at the residence on November 25 and 28, 2025. No caregiver arrived at or departed the Bruno residence, as reported in the signed Proof of loss. Care was not provided (or needed) during the period of surveillance.

136. On November 26, 2026, Continental performed surveillance on Patricia and Gabrielle beginning at the Bruno residence and arriving at a fundraiser.

137. Continental's surveillance documented Patricia at the fundraiser getting out of the passenger seat of a vehicle unassisted, walking independently without a cane or walker into and out of the event, standing for long durations of time, conversing with others and gesturing with her hands, taking photos with her cell phone, balancing/holding a push cart with one foot, balancing a small box on and pushing the cart unassisted, and with a hand raised at the elbow above her head.

138. At no time was Gabrielle seen providing hands-on or standby assistance to Patricia, who clearly did not need it.

139. Continental's observations on video could not be reconciled with Patricia's recent interview, Defendants' representations and written Proof of Loss for the very same day. Some of Continental's many observations of Patricia at the event included the following:









**10. December 9, 2025 Benefit Eligibility Assessment**

140. On or about December 9, 2025, Patricia underwent an in-person Benefit Eligibility Assessment ("BEA") with an independent nurse-assessor who was not affiliated with Continental or Patricia. Patricia's husband and Gabrielle were present with her during the BEA.

141. During the BEA, Patricia reported experiencing small vessel neuropathy, chronic pain, and falls since 2020. She reported two recent falls – on September 12, 2025 walking outside; and on November 15, 2025 walking inside.

142. Patricia reported experiencing daily pain in her hands and toes for five-plus years due to small vessel neuropathy and in her right shoulder and ribs due to injuries sustained in the fall in September 2025. She reported driving two times a month to the supermarket a few miles from her home prior to the fall in September 2025.

143. Patricia refused to demonstrate ADLs during the BEA due to reported pain in her ribs and shoulder, being unable to bend and reach, and having poor range of motion.

144. Patricia and Gabrielle represented during the BEA that: Patricia required hands-on assistance for all six ADLs; Patricia needed and received hands-on assistance for mobility inside and outside the home; Patricia needed and used a cane or walker for transferring; Patricia required

assistance with personal hygiene due to incontinence; and Patricia had cognitive deficits requiring assistance with her medications.

145. Patricia, however, scored 29/30 on the MMSE that was administered during the BEA, which indicated that her cognition was objectively unimpaired.

**11. December 22, 2025 Video Interview of Gabrielle and Patricia, and Review of Continental's Social Media Search**

146. Continental completed the video interview of Gabrielle and Patricia on December 22, 2025.

147. Patricia completed the interview while in bed with the majority of the responses provided by Gabrielle.

148. Neither Gabrielle nor Patricia disclosed a pre-existing, personal relationship with SAL until they were asked about the owner, Davis Menya, being their neighbor. They confirmed he is a neighbor and member of their church.

149. Gabrielle reported being is a 1099 contractor with SAL, reporting 4 hours/day (the maximum approved), though claimed she provided more care due to cohabitation. Gabrielle stated that she is paid a portion of billed amounts after agency deductions. She acknowledged, upon questioning about it, that the SAL agency owner, Davis Menya, is their neighbor and fellow church member.

150. Most shockingly, Gabrielle admitted during the interview that she attended law school in Virginia Beach during time periods when Defendants reported in signed Proof of Loss that she was caring for Patricia in Pennsylvania each day. Patricia and Gabrielle acknowledged at least 120 days over six years Defendants submitted Proof of Loss to Continental representing that Gabrielle was providing home care to Patricia in Pennsylvania when, in fact, Gabrielle was

physically present at law school in Virginia. They obviously knew these representations were false. Thus, Gabrielle and Patricia admitted fraud.

151. The interviewer also reviewed a publicly available document regarding Gabrielle's professional background. The following employment history was depicted in the document:

Below is the representative's employment history for up to the last 10 years.

| Employment Dates | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 05/2025 - Present | Integrity Alliance, LLC | Investment Adviser Representative | Y | Newtown Square, PA, United States |
| 03/2024 - Present | Angel Army Associates, LLC | Founding Attorney | N | Newtown Square, PA, United States |
| 01/2021 - Present | Samaritans-At-Last, LLC | Caregiver | N | Newtown Square, PA, United States |
| 08/2022 - 10/2023 | Jauregui Law Firm, LLC | Legal Apprenticeship | N | Birmingham (Remote), AL, United States |
| 08/2020 - 08/2023 | Regent University School of Law | Full-time Law Student; Graduated Summa Cum Laude and 2nd in the Class; Awarded the Outstanding Graduate Award from the National Association of Women Lawyers; Time in Law School included various internships, teaching assistant, and graduate assistant roles as well as rigorous activity involvement. | N | Virginia Beach, VA, United States |
| 09/2020 - 06/2023 | Robertson Center for Constitutional Law | Dean's Fellow; Intern | N | Virginia Beach, VA, United States |
| 06/2014 - 08/2020 | Gabstar Productions | Film, Commercial, Digital Media, and New Media Producer | N | Burbank (also New York City / Philadelphia), CA, United States |

152. According to this information, Gabrielle held multiple other jobs during the very same time period when she was supposedly providing paid home care for her mother and attending law school in Virginia. Moreover, she reported an affiliation with SAL dating back only to 2021 when, by contrast, Defendants represented to Continental in Proofs of Loss that Gabrielle had been a contractor of SAL and Patricia's paid caregiver since 2019. Gabrielle had no plausible explanation for how she worked these other jobs and attended law school in Virginia while supposedly caring for her mother in Pennsylvania. Nor did she have a plausible explanation for the two-year gap between the date when her relationship with SAL supposedly incepted (as represented to Continental) and actually began (as made clear from her resume).

153. Gabrielle was shown Proof of Loss, an invoice and weekly care notes that were submitted to Continental, stating that Gabrielle provided care to Patricia every day in November of 2022, including housekeeping, meal preparation, activities, medication reminders, and transfers. The interviewer showed Patricia and Gabrielle the following Thanksgiving 2022 social media post suggesting that Patricia was surprised to see Gabrielle who she "thought would be in Virginia studying for finals."




154. Upon questioning about this, Gabrielle responded defensively: "It was two, three years ago at this point. I'm not sure. I think we should move on." In other words, Gabrielle had no plausible explanation for having billed for care in Pennsylvania when she was obviously studying in Virginia.

155. Gabrielle and Patricia also had no plausible explanation for the following additional social media posts in which Patricia was shown exhibiting a high degree of functionality that was irreconcilable with her representations to Continental or the notion that she needed care:




156. Patricia and Gabrielle were asked about the multiple surveillance videos that showed Patricia dancing. Patricia and Gabrielle attributed these periods of observed functionality to temporary "miracles" that took place during religious gatherings.

**E. <u>Continental's January 16, 2026 Decision Letter</u>**

157. Based on all information in its possession, Continental closed its investigation and determined that Defendants had, in fact, engaged in fraud.

158. Based on the totality of the evidence – including multiple periods of surveillance, interviews and admissions of Patricia and Gabrielle, a social media review, and Proof of Loss submitted to Continental – Continental determined that Defendants had engaged in a protracted and intentional scheme to defraud Continental.

159. The evidence confirms that Patricia's functional limitations were a fabrication. Despite Defendants' representations to Continental that Patricia required significant assistance with ADLs, surveillance and admissions of Patricia and Gabrielle revealed that Patricia was fully capable of independent movement, full cognition and community activity.

160. Furthermore, by failing to disclose to Continental the fact that Patricia's putative caregiver identified in signed Proof of Loss was, in fact, Gabrielle, Patricia's daughter who lived with her, Defendants were able to obtain benefit payments from Continental that would have been denied had they told the truth, since Gabrielle is not an eligible home health care provider. This was fraud.

161. In addition, Defendants represented to Continental over the life of Patricia's claim that she required and received Long Term Care services pursuant to a written Plan of Care when, in fact, she did not. This was fraud.

162. Finally, Defendants were required to provide true and correct written Proof of Loss to Continental in which they specified the dates, times, and nature of care services Patricia allegedly received from an eligible paid caregiver, plus the amounts she actually paid for care. Continental was only required to pay benefits to the extent Defendants provided true and correct Proof of Loss for paid care services Patricia actually received, and Defendants billed for services not rendered. This was fraud.

163. By letter dated January 16, 2026 to Patricia, the claim was closed and Continental withdrew its approval of SAL (and Gabrielle) as a caregiver effective October 31, 2025, the last date for which Continental paid benefits, due to the lack of an eligible provider, billing for services not rendered and misrepresentations identified during Continental's investigation regarding Patricia's care needs.

164. The letter indicated that, during the interviews on October 27 and December 22, 2025, Patricia and Gabrielle each confirmed that Gabrielle is Patricia's caregiver and daughter, and that Gabrielle resides with Patricia and her husband. Gabrielle would not be eligible to provide home care under the Policy as the Policy does not allow for a member of Patricia's immediate family living with her to be either a Home Health Care Provider or an Independent Caregiver.

165. In the letter, Continental advised that, in reliance upon claim submissions which Continental now knows included misrepresentations, it paid benefits totaling $209,780.00 for services reportedly provided by Gabrielle through SAL.

166. Continental paid these benefits as a direct result of Defendants' material misrepresentations and are subject to recovery in this lawsuit.

167. Continental also waived a total of $9,509.78 in premium as a result of the fraudulent triggering of the Waiver of Premium Benefit. But for Patricia's fraudulent claim, these premium amounts would not have been waived and the Policy would have lapsed and terminated for nonpayment of premium.

168. Defendants' conduct was protracted and egregious, and was of such a nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages, plus an award of fees.

169. Additionally, Continental is entitled to a declaration that the Policy is void due to (a) Patricia's breach of the implied covenant of good faith and fair dealing between the parties and to protect Continental from future harms; and (b) under inherent power of the Court to adjust equities to compensate Continental for a portion of its losses. In this regard, there is case or controversy between Continental and Patricia for which there is no adequate remedy at law.

**COUNT I – FRAUD**
**(Against All Defendants)**

170. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

171. Defendants, acting with a common plan, scheme and design, did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Continental as described in this Complaint, in the following ways:

a. Creating and perpetuating the false impression that SAL and/or Gabrielle provided care to Patricia on dates and at times when, in fact, no care was provided;

b. Creating the impression that Patricia was unable to perform two or more ADLs without hands-on or standby assistance when, in fact, she was fully capable of performing all ADLs;

c. Creating the impression that Patricia was cognitively impaired when, in fact, she was not;

d. Creating and perpetuating the false impression that Patricia's care needs, if any, were greater than they were in-fact;

e. Creating and perpetuating the false impression that SAL and/or Gabrielle provided specific kinds of care services to Patricia when, in fact, they did not do so;

f. Creating and perpetuating the false impression that Patricia received Long Term Care services in accordance with a Plan of Care when, in fact, she did not;

g. Creating and perpetuating the false impression that Gabrielle was not a member of Patricia's immediate family living with her, and was therefore eligible to serve as a covered caregiver under the Policy; and

h. Creating and perpetuating the false impression that Patricia paid for care when she did not pay for care, or did not pay the amounts reported to Continental.

172. Defendants made and perpetuated these misrepresentations repeatedly over a continuous period of more than five years with knowledge of their falsity.

173. Defendants made and perpetuated these misrepresentations with knowledge and intent that the false information would be relied upon by Continental for their benefit and to Continental's detriment.

174. Continental relied on Defendants' misrepresentations.

175. Continental was justified in its reliance.

176. As a direct and proximate result of Defendants' fraudulent misrepresentations, Continental was harmed by paying benefits in the amount of $209,780.00 that Defendants were not lawfully entitled to receive and by waiving premium in the amount of $9,509.78 that ought to have been paid.

177. Upon information and belief, Defendants each received a portion of the benefit payments in exchange for participating in the scheme against Continental.

178. Continental incurred additional losses in an amount to be determined at trial relating to its cost of investigating the claim.

179. Defendants' conduct was protracted and egregious, and was of such a nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

**COUNT II – CIVIL INSURANCE FRAUD PURSUANT TO PENNSYLVANIA'S INSURANCE FRAUD ACT, 18 PA C.S.A. 4117(A)(2)**
**(Against All Defendants)**

180. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

181. Defendants, acting with a common plan, scheme and design, did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Continental in support of Patricia's claim under the Policy issued by Continental as described in this Complaint, in the following ways:

a. Creating and perpetuating the false impression that SAL and/or Gabrielle provided care to Patricia on dates and at times when, in fact, no care was provided;

b. Creating the impression that Patricia was unable to perform two or more ADLs without hands-on or standby assistance when, in fact, she was fully capable of performing all ADLs;

c. Creating the impression that Patricia was cognitively impaired when, in fact, she was not;

d. Creating and perpetuating the false impression that Patricia's care needs, if any, were greater than they were in-fact;

e. Creating and perpetuating the false impression that SAL and/or Gabrielle provided specific kinds of care services to Patricia when, in fact, they did not do so;

f. Creating and perpetuating the false impression that Patricia received Long Term Care services in accordance with a Plan of Care when, in fact, she did not;

g. Creating and perpetuating the false impression that Gabrielle was not a member of Patricia's immediate family living with her, and was therefore eligible to serve as a covered caregiver under the Policy; and

h. Creating and perpetuating the false impression that Patricia paid for care when she did not pay for care, or did not pay the amounts reported to Continental.

182. Defendants made and perpetuated these misrepresentations repeatedly over a continuous period of more than five years with knowledge of their falsity.

183. Defendants made and perpetuated these misrepresentations with knowledge and intent that the false information would be relied upon by Continental for their benefit and to Continental's detriment.

184. Continental relied on Defendants' misrepresentations and Continental was justified in its reliance.

185. As a direct and proximate result of Defendants' fraudulent misrepresentations, Continental was harmed by paying benefits in the amount of $209,780.00 that Defendants were not lawfully entitled to receive and by waiving premium in the amount of $9,509.78 that ought to have been paid.

186. Upon information and belief, Defendants each received a portion of the benefit payments in exchange for participating in the scheme against Continental.

187. Continental incurred additional losses in an amount to be determined at trial relating to its cost of investigating the claim.

188. Defendants' pattern of conduct was protracted and egregious, and was of such a nature that it shocks the conscience and justifies an award of treble damages in addition to compensatory damages.

**COUNT III – CIVIL CONVERSION**
**(Against All Defendants)**

190. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

191. Defendants, and each of them individually, knowingly and intentionally deprived Continental of insurance benefits totaling $209,780.00 that should not and would not have been paid but for Defendants' fraud and deceit, plus premiums that ought to have been paid in the amount of $9,509.78 but for Defendants' fraud and deceit.

192. Defendants had no lawful right to receive this money, or to retain possession of the money once it was received.

193. Continental demanded reimbursement of the benefits paid as a result of Defendants' misrepresentations, and it was not reimbursed.

194. Notwithstanding the absence of any right to receive or retain possession of the money, Defendants did, in fact, receive and retain possession of the money.

195. Defendants' receipt and retention of the money constituted a wrongful taking and theft.

196. Defendants knew that the money was received and retained through fraud and deceit, and that Continental would not have paid the money had it known the true facts about Patricia's claim at the inception of the claim. Thus, Defendants knew the money they received from Continental or else withheld was taken without Continental's consent and without lawful justification.

197. As a result of this theft, Defendants are liable to Continental in the amount of $209,780.00, plus interest, fees and costs.

198. Defendants' conduct was protracted and egregious, with a reckless indifference to Continental's rights, and was of such a nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

**COUNT IV – CIVIL CONSPIRACY**
**(Against All Defendants)**

199. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

200. Defendants knowingly and intentionally formed and operated a conspiracy with the common plan, scheme and design of extracting insurance benefits from Continental through fraud and deceit.

201. Each of the Defendants was aware of and ratified the conduct of the other participants in the conspiracy.

202. Each of the Defendants performed one or more wrongful acts in furtherance of the conspiracy and each Defendant benefitted from the conspiracy.

203. As a result of the conspiracy, Continental was harmed by paying $209,780.00 in benefits that it would not have paid if it knew the true facts about Patricia's claim from the inception of the claim, and waiving an additional $9,509.78 in premium that ought to have been paid. As a result of the conspiracy, each of the Defendants is vicariously liable for the acts of the other Defendants.

**COUNT V – RESTITUTION OF BENEFITS PAID**
**(Against All Defendants)**

204. Continental incorporates the preceding paragraphs of the Complaint as though stated fully herein.

205. Continental has no present obligation to pay benefits under the Policy due to one or more of: (1) Patricia's lack of a qualifying ADL deficiency and/or cognitive impairment; (2)

Patricia's failure to receive care from any caregiver; (3) Patricia's failure to receive the care represented to Continental; (4) Patricia's failure to receive Long Term Care services pursuant to a Plan of Care; (5) Defendants' failure to provide Continental with true and correct Proof of Loss in support of Patricia's claim; and/or (6) Gabrielle's inability to qualify as an approvable caregiver under the Policy due to being a member of Patricia's immediate family living with her.

206. Continental had no obligation to pay benefits under the Policy during some or all of the period of Patricia's claim due to one or more of: (1) Patricia's lack of a qualifying ADL deficiency and/or cognitive impairment; (2) Patricia's failure to receive care from any caregiver; (3) Patricia's failure to receive the care represented to Continental; (4) Patricia's failure to receive Long Term Care services pursuant to a Plan of Care; (5) Defendants' failure to provide Continental with true and correct Proof of Loss in support of Patricia's claim; and/or (6) Gabrielle's inability to qualify as an approvable caregiver under the Policy due to being a member of Patricia's immediate family living with her.

207. Continental demanded reimbursement of the benefits paid as a result of Defendants' misrepresentations, and it was not reimbursed.

208. Because Continental has made an overpayment of benefits, Continental is entitled to restitution in the amount of the benefits paid by Continental for all time periods as may be determined by the Court.

**COUNT VI - NEGLIGENCE**
**(Against Gabrielle and SAL)**

209. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

210. Gabrielle and SAL had an ongoing duty to provide true and correct information to Continental concerning Patricia's functionality and cognition, claim for benefits under the Policy,

alleged receipt of care and payment for care, and the familial relationship between Patricia and Gabrielle.

211. By providing false information to Continental and concealing truthful information from Continental as described in this Complaint, Gabrielle and SAL breached their duty to Continental.

212. Continental reasonably relied to its detriment on the false information supplied by Gabrielle and SAL, paying insurance benefits Patricia was not lawfully entitled to receive.

213. Thus, the false information supplied by Gabrielle and SAL to Continental both caused and proximately caused harm to Continental.

214. Continental was damaged in the amount of $209,780.00, which Continental would not have paid but for Gabrielle and SAL's submission of false information. Continental additionally waived $9,509.78 in premium that ought to have been paid.

**COUNT VII – NEGLIGENCE FAILURE TO TRAIN**
**(Against SAL)**

215. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

216. SAL owed a duty to exercise reasonable care in training its employees.

217. SAL, as Gabrielle's purported employer, had an ongoing duty to exercise reasonable care in training her.

218. SAL failed to provide training to Gabrielle that a reasonably prudent employer would have provided under the circumstances, including instruction that she could not bill for care services that were not rendered nor be an eligible caregiver because she was an immediate member of Patricia's family living with her.

219. It was reasonably foreseeable that harm would result to Continental because SAL failed to train or instruct Gabrielle regarding proper timekeeping and billing procedures and caregiver eligibility and qualifications.

220. Gabrielle's inadequate training by SAL was a substantial factor in causing harm to Continental.

221. But for SAL's breach of its duty to adequately train Gabrielle, misrepresentations in Proof of Loss submissions to Continental and in Gabrielle acting as Patricia's caregiver would have been avoided.

222. Continental was damaged in the amount of $209,780.00, which Continental would not have paid but for SAL's failure to adequately train Gabrielle. Continental additionally waived $9,509.78 in premium that ought to have been paid.

**COUNT VIII – UNJUST ENRTICHMENT**
**(Against Gabrielle and SAL)**

223. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

224. Continental conferred a benefit on Defendants by paying benefits in the amount of $209,780.00 for Patricia's claim that Continental would not have paid but for Defendants' misrepresentations.

225. Defendants knew and appreciated this benefit and provided false information to Continental and concealed truthful information from Continental as described in this Complaint to obtain the benefit.

226. Gabrielle reported being is a 1099 contractor with SAL.

227. Gabrielle admitted that she was paid a portion of amounts billed by SAL to Continental for Patricia's purported care after agency deductions.

228. Gabrielle acknowledged errors on SAL invoicing.

229. Gabrielle admitted billing Continental for care services through SAL when she was not present with Patricia.

230. Gabrielle and SAL accepted and retained the benefits paid by Continental in the amount of $209,780.00 for Patricia's claim under false pretenses as described in this Complaint.

231. Continental demanded reimbursement of the benefits paid as a result of Defendants' misrepresentations, and it was not reimbursed.

232. It was inequitable and unjust for Gabrielle and SAL to retain the benefits under the circumstances described in this Complaint.

233. Gabrielle and SAL were unjustly enriched and Continental was damaged in the amount of $209,780.00, which Continental would not have paid but for Defendants' submission of false information.

**COUNT IX – BREACH OF CONTRACT**
**(PLEADED IN THE ALTERNATIVE TO COUNT I)**
**(Against Patricia)**

234. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

235. At all material times, the Policy formed a valid and binding contract between Patricia and Continental.

236. In order to assert a valid claim for benefits under the Policy, Patricia was required to receive Long Term Care services pursuant to a written Plan of Care.

237. In order to assert a valid claim for benefits under the Policy, Patricia was required to provide written Proof of Loss to Continental.

238. The written Proof of Loss submitted by Patricia to Continental in support of her claim for benefits under the Policy needed to be true and correct in order for Continental to determine whether benefits were owed, and the amount of benefits owed, if any.

239. In order to assert a valid claim for benefits under the Policy, Patricia was required to received care from an eligible caregiver who was not a member of her immediate family living with her.

240. As discussed throughout the Complaint and incorporated by reference herein, Patricia made a claim for benefits under the Policy and she did not receive Long Term Care services pursuant to a Plan of Care, submitted materially false Proof of Loss to Continental, and did not receive care from an eligible caregiver. At minimum, the Proof of Loss submitted to Continental falsely represented:

a. The identity of Patricia's caregiver;

b. The dates and times when care services were provided, if any;

c. The amounts paid for care services rendered, if rendered at all;

d. The nature and level of care services necessary, if at all;

e. The nature and level of care services provided, if any; and

f. Whether the Long Term Care services were provided in accordance with a Plan of Care.

241. By submitting Proof of Loss that contained materially false information, failing to receive Long Term Care services in accordance with a Plan of Care, and concealing and failing to disclose her familial relationship with Gabrielle, Patricia repeatedly breached the requirements of the Policy and caused Continental to pay insurance benefits that Patricia was not contractually or legally entitled to receive.

242. Similarly, by submitting Proof of Loss that contained materially false information, failing to receive Long Term Care services in accordance with a Plan of Care, and concealing and failing to disclose her familial relationship with Gabrielle, Patirica failed to satisfy contractual conditions precedent to the payment of a claim for benefits and, in fact, failed to perfect a claim for benefits under her Policy.

243. As a result of Patricia's breaches and failure to satisfy conditions precedent, Continental has been damaged in an amount in excess of $209,780.00. Continental additionally waived $9,509.78 in premium that ought to have been paid.

**COUNT X – DECLRATION THAT THE POLICY IS VOID**
**(Against Patricia)**

244. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully herein.

245. The Policy should be declared void by the Court for three primary reasons.

246. There is an actual, present, and justiciable controversy between the parties as to whether the Policy is void for which there is no adequate remedy at law.

**A. Declaration that the Policy Constructively Lapsed and Terminated**

247. As discussed, Patricia was required to pay premium for the Policy to remain in-force. If Patricia failed to pay premium timely, the Policy would lapse and terminate.

248. The Policy included a Waiver of Premium Benefit. By operation of that Benefit, Patricia was not required to pay premium during the pendency of a legitimate claim for benefits because her premium obligation was waived.

249. By initiating and perpetuating a fraudulent claim for benefits against Continental as described in this Complaint, Patricia triggered the Waiver of Premium Benefit in the Policy fraudulently, meaning Patricia failed to pay the premium required for the Policy to remain in-force

during the pendency of the claim as a direct and proximate result of her fraud. This unpaid premium amount totaled $9,509.78.

250. But for Patricia's fraud, the Waiver of Premium Benefit would not have been triggered and the Policy would have lapsed and terminated due to Patricia's nonpayment of premium over the duration of the claim.

251. Patricia is estopped to claim the protections of the Waiver of Premium Benefit because her claim was fraudulent and the Waiver of Premium Benefit was triggered fraudulently. Indeed, Patricia was obligated to pay premium during the pendency of the claim but did not do so.

252. Continental is therefore entitled to a judicial declaration that the Policy constructively lapsed and terminated due to Patricia's nonpayment of premium during the pendency of the fraudulent claim.

253. In the alternative, Continental seeks and is entitled to a judicial declaration that the Policy is void under the inherent power of the Court to adjust the equities between the parties for two additional reasons, discussed below.

### B. Declaration that the Policy is Void Due to Patricia's Bad Faith and to Protect Continental from Future Harms

254. It is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Policy void so Continental is not forced to remain in contractual privity with a party who has committed fraud and/or acted in bad faith and may attempt to commit additional frauds against Continental in the future.

255. Insurance contracts are agreements *uberrimae fidei* and are undergirded by a mutual implied covenant of good faith and fair dealing.

256. By initiating and perpetuating a protracted fraud against Continental, Patricia has breached the implied covenant and demonstrated that she is incapable of proceeding in good faith

in an ongoing contractual relationship with Continental. Continental should be protected by the Court from the prospect of future frauds by Patricia.

257. The Policy is void from the inception of Patricia's fraudulent claim and should be declared to be of no legal effect, following the principles affirmed in *Lincoln Benefit Life Co. v. Dallal*, No. 21-55152, 2022 WL 605709 (9th Cir. March 1, 2022).

### C. Declaration that the Policy is Void Under the Inherent Power of the Court to Adjust Equities to Compensate Continental for a Portion of Its Losses

258. It is necessary and appropriate for the Court to exercise its equitable powers to declare the Policy void as a means of compensating Continental for a portion of the losses attributable to Patricia's fraudulent conduct.

**WHEREFORE,** Continental respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;
2. Punitive damages;
3. Statutory treble damages;
4. Attorneys' fees;
5. The costs of litigation;
6. A judicial declaration that the Policy is void;
7. A judicial declaration that Continental may retain some or all of the premium paid for the Policy;
8. Restitution of benefits paid under the Policy since a date to be determined by the Court;
9. Such other relief as may be demonstrated at trial; and
10. Such other relief as the Court deems just and proper.

Date: September 18, 2026

Respectfully submitted:

COZEN O'CONNOR

By: */s Allison B. Goldis*
Michael D. Rafalko, Esquire
Allison Bressler Goldis, Esquire
PA Attorney ID Nos. 200945/ 90596
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
P: 215-665-4611/ 215-665-7241
F: 215-372-2360/ 267-503-1546
mrafalko@cozen.com/ agoldis@cozen.com
*Attorneys for Plaintiff*
*Continental Casualty Company*